The Supervisors of the Town of La Pointe vs. O'Malley and another.

THE SUPERVISORS OF THE TOWN OF LA POINTE vs. O'MALLEY and another.

PLEADING. *(1) Construction of complaint.* RIGHT TO OFFICE. *(2–6)
What constitutes* prima facie *right. Such right conclusive until impeached by* quo warranto. *Duty of predecessor in office.*

1. A complaint which contains in form three distinct counts, but all for the same alleged indebtedness, so construed as to render the averments of the several counts consistent with each other; it being susceptible of such a construction.

2. When the result of the canvass of votes cast at a legal election, as declared by the proper canvassing officers, shows the election of a certain person to an office, and he qualifies within the time and in the manner prescribed by law, he is entitled to the office as against every other person laying claim thereto, until the result so declared is set aside by the judgment of some competent court in a direct proceeding for that purpose; and every other person who assumes to exercise the duties of such office (as by holding over after the expiration of a former term), must be treated as a mere intruder or usurper, in any proceeding against him to compel him to deliver up the books and papers pertaining thereto, or to recover moneys or other property in his hands which he is required by law to deliver over to his successor in office.

3. It makes no difference in the application of the foregoing rule, that the predecessor in office was himself a candidate for reëlection, and, on the ground of some alleged error or fraud in the vote or the canvass, or the declaration of the result, claims that he and not his opponent was duly elected. Such claimant, not having, by *mandamus* (as might be done in a proper case), compelled the canvassers to give him the certificate of election, cannot retain the office as against an opposing claimant of the character above described, who demands the same, and put the latter to an action of *quo warranto*, but must himself proceed by such an action.

4. In an action on the official bond of O. as town treasurer, for his neglect to deliver moneys, etc., in his hands to his successor, the evidence for plaintiffs was, that at the close of the polls on the day of election the *chairman* of the town board of supervisors announced publicly as the result of the election, that one S. was elected to the office of treasurer; that a statement of the result of the election was drawn up on the records of the town, by authority of the inspectors, and signed by the *town clerk*, but not signed by the inspectors as required by the statute; that this statement showed the whole number of votes cast, and the number cast

for each candidate, from which it appeared that S. had a majority of the whole; that the statement made by the town clerk to the county clerk, as required by statute, showing the names of the persons elected to the several town offices at such election, contained the name of S. as town treasurer; that the town clerk also, six days after the election, notified S. in writing of his election; and that S. duly qualified. O., in his answer and testimony, did not deny that S. received a majority of the votes cast, or that the tally sheets showed a majority for S., but claimed that he himself received a majority of the *legal* votes cast. *Held*, that the evidence as to S.'s right was properly admitted, and warrants a · judgment that there was a breach of the bond in suit, in O.'s failure to pay over to S. the moneys in his hands.

5. The mere fact that O., for a few days after his term expired, refused to deliver up the books and papers, and performed some duties pertaining to his office, did not render him treasurer *de facto* in such a sense as to prevent a recovery in this action of moneys in his hands which he ought to pay over to S.; he having had no color of title, and there having been no unreasonable delay in asserting the rights of S. or in bringing this action.

6. The act of S. in taking and filing the oath of office and his official bond, and demanding of O. the moneys, books, etc., in his hands, would have been sufficient to warrant *quo warranto* against him by a hostile claimant.

ORTON, J., dissents from the judgment, holding, (1) That it does not appear from the record that at the town election in question there was any *canvass* of the votes, or *determination* of the result, by the *inspectors*, or that the names of the persons declared to be elected were ever read to the town meeting *by the clerk*, or that the inspectors ever made a "statement in writing" and "certificate" such as the statute requires, or that any such statement or certificate by them was left with the town clerk or recorded in his office. Tay. Stats., 360, §§ 62, 63. (2) That in the absence of these, S. has no *prima facie* right to the office. (3) That in the absence of any person having such a *prima facie* right, the former treasurer, holding over after his legal term, is *de facto* treasurer, and not an intruder, and is under no obligation to deliver the moneys and other property of his office to any person claiming to be his successor.

APPEAL from the Circuit Court for *Ashland* County.

Action on the official bond of *John O'Malley*, late treasurer of the town of La Pointe, to recover town moneys which came to his hands as such treasurer, and which, it is alleged, he refused to account for or pay over to his successor in office.

The complaint contains in form three counts. "As a first

cause of action," it is alleged that *O'Malley* was, at the election in said town held in April, 1874, elected town treasurer for the year next ensuing; that he took the oath of office, filed his bond, duly approved, in which the defendant *Vaughn* and another person were sureties, and entered upon said office; that he continued to exercise said office during said year and thenceforward continually until the 3d of April, 1877, when one Stahl was duly elected town treasurer in his stead, and accepted, qualified, and entered upon the duties of that office; that said *O'Malley*, as such treasurer, received, during the year 1874, certain specified sums of money, the property of said town, to wit:

April 7, 1874, from his predecessor in office...................... $15,990 63
September 12, 1874, from the county treasurer of Ashland county,
    on account of delinquent taxes................................. 3,466 34
December 17, 1874, from the same, on same account........... 1,280 83
September 30, 1874, from same, on account of drainage fund.... 1,085 05
November 14, 1874, from same, on county order............... 495 16
Collected on tax-roll for 1874, and retained for use of said town.. 5,304 26

    Total......................................, .............. $27,622 27

That of all said moneys, "he has paid over according to law, upon orders made upon him or otherwise in any manner whatsoever, only the sum of $14,983.50; and that there remained of the said moneys in his hands, as such treasurer, when his said successor (Stahl) was elected and qualified," the sum of $12,638.77; and that he refused to pay over the same to his said successor, on due demand by him therefor.

As a "second cause of action," the complaint alleges *O'Malley's* election in April, 1875, as treasurer of said town for the year next ensuing, the filing of his bond, duly approved, with the same sureties above mentioned, his taking the oath and entering upon the duties of said office, and that he continued to exercise the same until the expiration of said year and thenceforward continually until the 3d of April, 1877, when said Stahl was duly elected, etc., as previously alleged; that during said second year he received, as such

treasurer, certain specified sums, the property of said town, to wit:

| | | |
|---|---:|---:|
| April 8, 1875, from the county treasurer, on account of delinquent taxes......... ................................... | $347 | 48 |
| August 18, 1875, from the same, on account of drainage fund... | 295 | 46 |
| Collected upon tax-roll for 1875, and retained for the use of said town.............................................. | 1,708 | 44 |
| Received from his predecessor for the preceding year, and held, and was chargeable for, additional balance of.............. | 22,753 | 71 |
| Total .............................................. | $25,105 | 09 |

That of all said moneys, "he has paid over according to law, upon orders made upon him or otherwise in any manner whatever, only the sum of $12,466.32, and there remained of said moneys in his hands as such treasurer, when his said successor was elected and qualified," the sum of $12,638.77; and that he refused to pay over the same to his said successor, on due demand by him therefor.

As a "third cause of action," the complaint alleges *O'Malley's* election in April, 1876, as treasurer of said town for the next ensuing year, the filing of his bond, duly approved, with said *Vaughn* and another person as sureties, his taking of the oath and entry upon the duties of said office, and that he continued to exercise the same until the 3d of April, 1877, when said Stahl was duly elected, etc., as previously alleged; that during said third year he received, as such treasurer, certain specified sums, the property of said town, to wit:

| | | |
|---|---:|---:|
| September 15, 1876, from the county treasurer, on account of delinquent taxes ............................................. | $673 | 48 |
| October 27, 1876, from the same, on account of school moneys.... | 44 | 28 |
| October 27, 1876, from the same, on account of drainage fund.... | 50 | 00 |
| Collected on the tax-roll for 1876, and retained for the use of said town................................................. | 2,128 | 43 |
| Received from his predecessor for the preceding year, and held, and was chargeable for, an additional balance of ................. | 23,766 | 09 |
| Received for liquor licenses.................................... | 75 | 00 |
| Total ............................................. | $26,737 | 28 |

That of all said moneys "he has paid over according to law, upon orders made upon him or otherwise in any manner whatever, only the sum of $14,098.51, and there remained of said moneys in his hands as such treasurer, when his said successor was elected and qualified," the sum of $12,638.77; and that he refused to pay over the same to his successor, on due demand therefor.

Judgment is thereupon demanded against the defendants, upon each of said official bonds, for the penal sum therein named ($15,000), with leave to issue execution for said sum of $12,638.77, with interest, etc.

The answer admits that *O'Malley* was town treasurer as alleged in the complaint; that he received as such from his predecessor in office, of funds belonging to said town, $11,136.88; that during his first term he received of such funds the further sum of $10,016.65; during his second term, $1,766.90, and during his third term, $2,925.35; but it denies that, except as above stated, he had or received, during said years, any moneys of said town. It admits that he paid out for and on account of the town, while such treasurer, "the several sums in that behalf mentioned in the complaint." It then alleges that on the 3d of April, 1877, *O'Malley* was elected to the office of treasurer of said town by a majority of the legal votes cast for that office, and immediately after qualified and entered upon the discharge of the duties of said office, and from that time hitherto has been in the possession of the office, and of the books, records and papers belonging thereto, and in the discharge of its duties, and, between the 9th of April, 1877, and the commencement of this action, had paid out $1,747 upon orders drawn on the treasurer of said town, and had also paid, of moneys in his hands as such treasurer, $1,030 to the treasurer of a certain school district therein; that on said 9th of April, 1877, plaintiffs and said *O'Malley* accounted together concerning the money of the town in his hands as such treasurer, and there was then found in his hands,

of such moneys, $3,412.64; and it averred that no greater sum was then in his hands as such treasurer.   It is admitted that said Stahl, before the commencement of this action, demanded of *O'Malley* the money, books, etc., belonging to said office; and it is alleged that the latter refused to surrender the same because he then was, and now is, the legally elected treasurer of said town.   It is admitted that Stahl, claiming to have been elected to said office on the 3d of April, 1877, took the oath of office and gave the bond, which was approved, as alleged in the complaint; but it is denied that he was in fact duly elected to said office; and all other allegations of the complaint, not thus expressly admitted, are denied.

The cause was tried by the circuit judge without a jury. After finding the facts as alleged in the complaint as to the election of *O'Malley* in April, 1876, as town treasurer for the year next ensuing, the execution of his bond, etc., he further found that he received from his predecessor in office $21,271.90, and during his said term received the further sum of $3,259.71, making a total of $24,531.61, of moneys belonging to the town; that of these he disbursed $14,098.51, leaving a balance in his hands of $10,433.10 at the expiration of his term of office, April 3, 1877; that at the annual town meeting on the day last mentioned, said Stahl was duly elected to the office of treasurer of said town, and was declared elected to that office immediately after the result of the election was determined by the inspectors thereof; that, within the time prescribed by law, he filed his oath of office and his bond, duly approved, and entered upon the duties of the office; and that *O'Malley*, on due demand by Stahl, refused to pay over to him said sum of $10,433.10.   On these facts he held plaintiffs entitled to judgment against defendants for the full penalty of the bond of 1876, and to execution for the sum last mentioned, with interest and costs.

The facts concerning the election of the treasurer of said

town in April, 1877, are more fully set forth in the opinion of Mr. Justice TAYLOR.

From a judgment in pursuance of the conclusions of law above stated, the defendants appealed.

For the appellants, there were separate briefs by *J. J. Miles*, their attorney, and *Geo. W. Cate*, of counsel, and an additional brief for the appellant *Vaughn* by *S. U. Pinney*, of counsel; and there was also oral argument by *Mr. Cate* and *Mr. Pinney*.

*Mr. Cate* contended, among other things, 1. That, as *O'Malley* was exercising the powers of the office in question, and was in possession of everything belonging to it, claiming the right to hold and enjoy it by virtue of an election, he was a *de facto* officer *(Aulanier v. Governor*, 1 Tex., 653; *Att'y Gen. ex rel. Bashford v. Barstow*, 4 Wis., 567; *Sauerhering v. Iron Ridge R. R. Co.*, 25 id., 447); and that, such being the case, no action like this could be maintained until the right to the office had been determined in a proceeding instituted for that purpose. *Re Boyle*, 9 Wis., 264; *State ex rel. Knowlton v. Williams*, 5 id., 308; *Aulanier v. Governor, supra*. If Stahl himself had brought an action against *O'Malley* to recover the books, etc., belonging to the office, and it had appeared that the defendant claimed himself to be the treasurer under an election, would not that be the end of the case? *Conover's Case*, 5 Abb. Pr., 73; *Devlin's Case*, id., 281; *Douglass v. Wickwire*, 19 Conn., 489; *Facey v. Fuller*, 13 Mich., 527; *Bean v. Thompson*, 19 N. H., 290; *Comm. v. McCombs*, 56 Pa. St., 436; *Bashford v. Barstow, supra*. If that is the rule in the case of one holding a certificate of election, who seeks to recover books, etc., of the person in possession claiming to have been elected, how can these supervisors, who are bound by the acts of the *de facto* officer, compel him to pay over the public funds in his hands upon the pretense that his successor has been elected? *O'Malley* being in possession

and in the open and public exercise of the duties of the office, the presumption of law is in favor of his right; and it was not claimed that there could be any recovery without overcoming this presumption by proof; accordingly plaintiffs undertook to prove, and the court found, that Stahl *received a majority of the votes.* But the title of the actual incumbent of a public office can be questioned only in an action for that purpose, and in which a judgment of ouster can be rendered. If this judgment should stand, nothing is determined except that the acting treasurer must pay to his successor the funds in his hands. The title to the office remains as before the suit was brought; *O'Malley* remains in possession, claiming to be the legally elected treasurer, an officer *de facto,* whose acts as such are binding upon the public and third persons. The judgment can be enforced only by execution; and the officer will be obliged to accept the receipt of the acting treasurer. If he should attempt to force a collection, a court of equity would interpose its mandate, when it was made to appear that the party proceeded against was in possession of the office claiming under an election, and that the title had not been determined. The tax roll also must go into the hands of the acting treasurer, who will go on collecting as before. If, however, an actual transfer to Stahl of the funds in *O'Malley's* hands is secured, the judgment will leave the office, with all the papers and records, in the hands of one person, and the *funds* in the hands of another; a condition of things which it has always been the policy of the law to prevent, by requiring the question of the right to an office to be determined before the funds, records and possession can be disturbed. It is said that defendants, after putting in their answer, should have brought *quo warranto* against Stahl to try the right to the office. But the proof is that *O'Malley* had been, up to the time of the trial, in the peaceable and undisturbed possession and enjoyment of the office, and that Stahl had never attempted to exercise any of its duties, but

on the contrary had recognized *O'Malley* as treasurer by presenting to him for payment orders drawn on the town treasurer; and that he was likewise recognized as such by the other town officers. Under such circumstances *O'Malley* could not properly bring the action. High on Ex. Rem., 457. 2. That the evidence did not sustain the judgment as to the amount of the town funds in *O'Malley's* hands at the expiration of his term. 3. That the court erred in not finding whether *O'Malley* was not treasurer *de facto;* and that if he was such treasurer, he should have been credited with the amounts which the evidence shows to have been paid out by him on town orders *prior to the trial.*

*Mr. Pinney,* on the same side:

The recovery here was had upon common-law proof of title in Stahl to the office in question; for he had no statutory evidence, at least none that would be regarded as *prima facie* evidence of title in a proceeding by *mandamus,* or one under the statute (R. S. 1858, ch. 156) to compel a delivery of the books and papers; and, for want of possession, he was without color of right so as to constitute him an officer *de facto.* The case does not fall within the rule in *People v. Head,* 25 Ill., 325; *Crowell v. Lambert,* 10 Minn., 369; *State ex rel. Atherton v. Sherwood,* 15 id., 221; *People v. Scannell,* 7 Cal., 432, that when a party has been *regularly declared elected,* and there exists *statutory evidence of his right* showing *prima facie* the validity of his title, and he qualifies, a *mandamus* will be awarded to compel the delivery to him of the books, records and papers belonging to the office. The statement and certificate in writing, which our statute requires to be *made by the inspectors* and recorded by the clerk (R. S., ch. 15, sec. 41), is the statutory evidence of title, and the only evidence which, under our statute, can be regarded as *prima facie* evidence of title sufficient to warrant the court, in a proceeding by *mandamus* or under the statute, to compel a delivery of the books and papers. Such statement and certificate having been made

by the inspectors and delivered to the town clerk, it is made the duty of the latter to notify persons elected to office, whose names are not on the poll list, of their election, and to transmit to the county clerk "a certified statement of all officers elected in his town." R. S., ch. 15, secs. 43, 46. The object of these provisions is to devolve on the person who has been so certified by the inspectors to have been elected, the duty of qualifying within the time limited by law, and to enable county officers, holding official relations to town officers, to have some evidence whether a person assuming to act as a town officer has been chosen as such. But the town clerk is to give such notification and forward such statement on the basis of the inspectors' certificate and statement, and to give effect to it. If, without any statement and certificate of the inspectors showing that a certain person has been elected to a certain office, or in contravention of their statement and certificate, the town clerk notifies such person that he has been elected to such office, and sends a certified statement of his election to the county clerk, he cannot thus furnish such person with *prima facie* evidence of his title to the office. The testimony shows that the statement signed by the clerk, on the town records, which was not in compliance with the statute, was produced as the only one made; and, even in the absence of such testimony, no presumption would exist that any other was made. *Jarvis v. Silliman*, 21 Wis., 600; *Iverslie v. Spaulding*, 32 id., 394. The parol proof shows that the inspectors compiled the statement, but it appears that they did not certify under their hands, upon such statement, their determination of the persons elected. The necessity of resorting to common-law proof to connect the inspectors with this statement, reduced Stahl's claim of title to the same *status* as *O'Malley's*, and left the latter with the advantage of position, in that he was in actual possession, while Stahl was out of possession; and *O'Malley*, having the books, papers and funds, and all the insignia of office, and continuing to act as treas-

urer, was *de facto* officer when this suit was commenced. An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons. Thus, where the functions of the office were exercised by one without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be, in such a case the person will be regarded as an officer *de facto*. And it was held in *Knowles v. Luce*, Moore, 109, by Baron MANWOOD, that an officer continuing to exercise his office after the expiration of his term was a good officer *de facto*. Courts take notice of the accession to office of certain officers, without proof, *but not of the right of a person not in possession*. Whoever may be the officer *de jure*, judicial recognition, in all cases where the question comes up collaterally, is accorded to the officer *de facto*. *State v. Bloom*, 17 Wis., 521; *State ex rel. Knowlton v. Williams*, 5 id., 308, and note of Ch. J. Dixon on p. 631.

If *O'Malley* believed that he was elected, it was his *duty*, as well as his right, to retain the funds, books and papers, and continue to act as treasurer. It was then a question of fact to be determined in an appropriate action, which of the claimants was actually elected. A regular canvass and certificate in favor of Stahl would be *prima facie* only, and could be answered by proof of the facts. There was no rule or principle of law requiring *O'Malley* to surrender to one whose entry upon the duties of the office would have been an act of criminal usurpation. He was not bound to surrender and then bring an action to be restored to a trust which he had faithlessly abandoned to a mere pretender. If he refused under claim of title asserted in the ordinary manner, and continued to perform the duties of his office, retaining the funds, books and papers, he was an officer *de facto*, whose acts, within the

scope of the functions of such office, were valid, so far as the public and third persons were concerned, until he was ousted by process of law. Every consideration of necessity and public policy requires that his acts should be held valid, and that his tenure of the office should not be disturbed except upon *quo warranto*. No proceeding having been taken to oust him, or to compel him to deliver over to Stahl the books and papers belonging to the office, the practical operation of the recovery is, to pass to Stahl the funds on hand, leaving all the books and papers in relation to the administration of the duties of the office in *O'Malley's* hands, and leaving him still to act as treasurer, and, of course, to receive such sums as might thereafter become due to the town. Thus the town would have two treasurers holding and disbursing its funds, and, without a resort to *quo warranto* to oust *O'Malley*, successive actions would have to be brought from time to time as he might receive town moneys; and in such actions there might be diverse decisions on the question of title. Such a course of proceeding would be like that of a party who, being ousted from his lands, should annually bring his action to recover the crops, but refrain from suing to recover the lands; and it would be destructive of all regularity and harmony of official administration, and lead to the most mischievous consequences. Title to the office cannot be tried in this collateral way, but only on *quo warranto*. *People v. Stevens*, 5 Hill, 616; *People v. Scannell*, 7 Cal., 432; *Devlin's Case*, 5 Abb. Pr., 282; *Mayor v. Conover*, id., 171, 177; *Allen v. McKeen*, 1 Sum., 317. If, upon an application for a *mandamus* to procure possession of official records, it appears that the relator's rights cannot be determined without an investigation into respondent's title, the writ will not be granted. High on Ex. Rem., § 78; *People v. Stevens*, *supra; People v. Olds*, 3 Cal., 167, 174–8; *State v. Pitot*, 21 La. Ann., 336–8; id., 18; *People v. Collins*, 7 Johns., 554. Nor would a court of equity have interfered by injunction to restrain *O'Malley*

from acting as treasurer. *People v. Draper*, 24 Barb., 265. 2. Defendants pleaded an accounting and settlement commenced March 27 and concluded April 10, 1877, by which there was found due from *O'Malley* $3,412.64; and this plea was fully sustained by the proof. This was an absolute bar to the recovery of any greater sum, unless plaintiffs, by proper *allegations* and proof, surcharged or falsified the account; and as to what allegations and proof are requisite to that end, see *Bruen v. Hone*, 2 Barb., 586–92, and cases there cited; *Nourse v. Prime*, 7 Johns. Ch., 69; *Bullock v. Boyd*, 2 Edw., 293; *White v. Walker*, 5 Fla., 478. A settled account can be opened only for fraud or errors specified, and which are palpable or clearly proved. *Baker v. Biddle*, Baldw., 418. A defendant is not entitled to open an account, unless a sufficient foundation has been laid in the answer for that purpose. *Slee v. Bloom*, 20 Johns., 669; *S. C.*, 5 Johns. Ch., 366. If there was a valid accounting and settlement, the cause of action is on such account and for the amount so found due. And in an action as on an unadjusted account, where the answer sets up an accounting and settlement, the plaintiff may reply in evidence that there was no such accounting and settlement, but he cannot reply by evidence of fraud or mistake, and by the evidence make an issue entirely outside of the pleadings. The true rule in all such cases is that which prevails in equity, that plaintiff must in his complaint charge the pretenses of the defendant, and then by direct allegation avoid them. Thus the matter to be tried and adjudged is placed on the record, which will show what has in fact been adjudicated. If defendants had pleaded a former recovery, could plaintiffs have answered by *evidence* that the recovery was fraudulent, and thus try without allegation a matter which would be substantive ground for a bill in equity to set aside or enjoin the judgment? Judgments must still be rendered *secundum allegata et probata;* and

this rule cannot be departed from without inextricable confusion. *Wright v. Delafield,* 25 N. Y., 266.

*Mr. Pinney* and *Mr. Miles* also contended that each separate and distinct count in a complaint must be construed by itself, and cannot be aided by the allegations of any other count *(Curtis v. Moore,* 15 Wis., 134; *Catlin v. Pedrick,* 17 id., 88; *Sabin v. Austin,* 19 id., 421); and that, thus construing the several counts, the complaint admits that defendant disbursed $14,983.50 of the moneys received during his first term, and $12,466.32 of those received during his second term, and $14,098.51 of those received during his third term; and these admissions are fatal to plaintiffs' claim. The fact that the complaint is false and absurd on its face, does not alter the effect of such admissions. 1 Greenl. Ev., §§ 27, 171, 186, 205, 527.

For the respondents, there were briefs by *John H. Knight,* their attorney, and oral argument by *Mr. Knight* and *Wm. F. Vilas:*

1. While, in certain cases, the law holds the acts of a *de facto* officer valid, and forbids inquiry into his title, as immaterial, these are not cases *in which the officer is a party.* The principle is applied only for the benefit of the public and of third persons, and not of the officer, except where he is not a party and cannot defend his title. The rule does not operate in favor of the officer, who is bound to know the defects of his title. *Conover v. Devlin,* 15 How. Pr., 470, which overrules the cases cited by appellant's counsel. See also *The People v. Hopson,* 1 Denio, 574, per BRONSON, C. J., p. 579; *Cummings v. Clark,* 15 Vt., 653; *Green v. Burke,* 23 Wend., 490; *Fowler v. Beebe,* 9 Mass., 231; *Colburn v. Ellis,* 5 id., 427; *Thayer v. Stearns,* 1 Pick., 109; *Pike v. Hanson,* 9 N. H., 491; *Blake v. Sturtevant,* 12 id., 567; *Tucker v. Aiken,* 7 id., 113; *Town of Plymouth v. Painter,* 17 Conn., 585; *Keyser v. McKissan,* 2 Rawle, 139; *Riddle v. County of Bedford,* 7 S.

& R., 386.    2. *O'Malley* was not a *de facto* officer, because he had no color of an election or appointment, nor had there been an exercise of the office by him, and acquiescence on the part of the public, for such a length of time as would afford a strong presumption of at least a colorable election or appointment.    5 Wend., 234; *McGregor v. Balch*, 14 Vt., 436; *Town of Plymouth . v. Painter*, *supra; King v. Lisle*, Andrews, 163.    3. The certificate of election establishes *prima facie* the officer *de jure*, and entitles its holder, who has qualified, to discharge the duties of the office.    Whoever claims to be entitled of right to the office against him holding the certificate, must bring his proper action to annul the certificate and establish his right to the office.    *Crowell v. Lambert*, 10 Minn., 369; *State ex rel. Atherton v. Sherwood*, 15 id., 221; *Beebe v. Robinson*, 52 Ala., 66; 83 Ill., 128.    4. The answer alleged an accounting and settlement; but the proof did not sustain the allegation.    Moreover, the town supervisors are mere agents of the town, with no powers not given them by law *(Clark v. The City of Des Moines*, 19 Iowa, 199), and cannot bind it by adjusting and auditing an account which is *not a true account*.    In an action against a town treasurer to recover moneys received by him for the town, upon satisfactory evidence of a mistake in a settlement with him, or that he is actually indebted to the town, judgment should be rendered for the amount of his indebtedness.    *Sexton v. Supervisors*, 27 Wis., 349; *Supervisors v. Knipfer*, 37 id., 496.

TAYLOR, J.    The appellants make three principal points against the right of the respondents to recover in the action: 1. That the complaint does not show anything due from the late treasurer to the town.    2. That there was no sufficient proof that a successor to *O'Malley* as treasurer had been elected in said town, who was authorized to demand and receive the town moneys in his hands.    3. That *O'Malley* was treasurer *de facto* of the town, and that as such *de facto* treas-

urer he was entitled to the possession and custody of the funds of the town, and the question as to who was the treasurer *de jure* could not be tried in this action. They also allege, (4) that, in any view of the case, the judgment rendered in favor of the plaintiffs was for a larger sum than the evidence showed was in his hands as treasurer.

I. The complaint sets forth three separate causes of action. The allegations in each separate cause of action, taken alone, show that *O'Malley* has in his hands an amount of money belonging to the town, equal to the amount found due from him by the judgment of the court. We think that this is sufficient; that, for the purposes of the trial, the allegations stated in each separate cause of action must be taken as true for the purpose of making out the cause of action in such separate statement; and that the allegation in the second separate cause of action, that the defendant treasurer received from his predecessor in office the sum of $22,753.71, cannot be held to be false, even if the allegations in the first cause of action show that there was a much less sum in the hands of his predecessor in office at the commencement of his second term. But we do not think the allegations of the first cause of action do in fact contradict this allegation in the second. The allegations in the first do not show how much of the moneys which came to the defendant treasurer's hands during the first year of his office were spent by him in the lawful discharge of his duties during that year; they simply state that he received a gross sum, and that, during that year and the two next succeeding years, he expended a certain amount of the moneys so received by him. The whole complaint shows that the defendant treasurer held the office for three successive years, and that he was twice his own successor. There is no reason, therefore, for holding that the amount alleged to have been disbursed of the public funds received during his first term, must be held to have been disbursed during such term. The complaint does not so allege. And it is only by insisting

that the disbursements stated to have been made in the first and second causes of action, were made during said terms respectively, that there is any force to the argument that the complaint does not show that the treasurer had any money in his hands unexpended. We do not think the complaint is susceptible of the construction given to it by the counsel for the appellants; and it seems to us that the fair and reasonable construction is that put upon it by the counsel for the respondents, viz., that, in construing the complaint as a whole, the amount really admitted to have been lawfully expended by the treasurer during his first term of office is the difference between the gross amount received by him during that term and the sum charged as having been received from his predecessor at the commencement of his second term, as stated in the second cause of action; and that the sum admitted to have been lawfully disbursed during his second term of office is the difference between the gross amount charged to have been received during such second term and the sum charged as having been received from his predecessor at the commencement of his third term, as stated in the third cause of action. This construction renders the complaint consistent with itself, and does not in fact render any of the allegations in the several causes of action inconsistent or conflicting.

II. The counsel for the appellants insist that there is no sufficient legal evidence of the election of the successor of *O'Malley*, the defendant treasurer. The complaint alleges that Stahl was elected treasurer of said town at the April town meeting in 1877, and that he took the oath of office and filed his bond as required by law. The answer denies that Stahl was duly elected as alleged, but admits that he claims to have been so elected, and that he took the oath of office and gave his official bond, which was duly approved according to law. The answer also alleges that *O'Malley* was duly elected to the office of treasurer of said town at the April town meeting in 1877, by a majority of the legal votes cast at that election, and

that he qualified, and has since, and at the time of the commencement of this action, exercised the duties of such office as his own successor. This action was commenced on the 18th day of June, 1877.

The evidence of the election of Stahl as treasurer in 1877 was the following: John W. Bell testified that he was the chairman of the board of supervisors of the town of La Pointe, and acted as one of the inspectors of election at the town meeting in 1877; that at the close of the polls he publicly announced, or caused to be announced, the result of the election, and that Thomas Stahl was publicly declared elected to the office of town treasurer; that a statement of the result of the election was drawn up on the records of the town, and that the record shows the number of votes cast for each individual. On his cross examination he said: "I confidently know who was elected treasurer. The question as to who is town treasurer has never been disputed by the public." Joseph Riel testified that he was town clerk of the town of La Pointe, and that he was town clerk and acted as one of the inspectors of the election in April, 1877, and was present through the whole election; that after the ballots were all closed and the votes cast up, the result was publicly declared by John W. Bell, the chairman. "I recorded the result of such election in the records of the town clerk at length." The book containing this record was then offered in evidence, and that part of it relating to the election of town treasurer was as follows: "The whole number of votes cast for the office of town treasurer was 84, of which number *John O'Malley* received 40, and Thomas Stahl 44. Thomas Stahl is declared elected to the office of town treasurer." The record was signed only by Joseph Riel, town clerk. The plaintiffs also offered in evidence a notice of which the following is a copy:

"OFFICE OF TOWN CLERK.

"To THOMAS STAHL: SIR — This is to notify you that at the annual town meeting held in the town of La Pointe on the 3d

day of April, 1877, you were duly elected to the office of town treasurer of said town of La Pointe, having received a majority of the votes cast for that office.    Respectfully yours, &c.,

JOSEPH RIEL, *Town Clerk.*

"Dated April 9, 1877."

This was delivered to Stahl on the day it bears date.    The plaintiff also offered in evidence the statement of the town clerk made to the county clerk as provided by sec. 43, ch. 15, R. S. 1858, as amended by ch. 71, Laws of 1865, showing the names of the persons elected to the several town offices at the election in 1877.    This statement contained the name of Thomas Stahl as town treasurer.

*O'Malley* testified that he claimed to have a majority of the legal votes, and that he claimed to be legally elected treasurer of the town at the April election in 1877.    On his cross examination he testified:    "I would not turn over the books and papers to anybody else, because I claim to be elected legally. I was not elected at the last town election by the tally sheets. I heard the tally sheets showed four majority against me." This was all the evidence given on the question as to who was elected treasurer of the town in April, 1877.    The defendants objected to the evidence offered to show the election of Stahl as town treasurer, generally, as incompetent.    And when the notice, signed by the town clerk and directed to Stahl, notifying him of his election to the office of town treasurer, was offered in evidence, the counsel for the defendant objected to its being received, on the specific ground "that it was not competent for the court in this action to decide who is the proper town treasurer of La Pointe."    Although upon the argument of the case in this court it was insisted that, if it was competent for the circuit court to try the question as to who was in fact elected treasurer of the town, the evidence offered by the plaintiff was incompetent and insufficient, yet the great point of contest was, that that question could not be tried; that if the former treasurer refused to deliver up the

books and papers and surrender the office to the person elected as his successor, on the ground that he claimed to have been elected himself, no action could be maintained against him, either to compel him to deliver such books and papers, or for the recovery of the money in his hands, until the person so elected had first proceeded by *quo warranto* to oust him from the office.

The objection that the election of the successor of the defendant *O'Malley* was not sufficiently proved, it seems to me, is without any foundation in fact. The result of the canvass of the votes cast at that election, although not proved in all respects by the formal papers directed to be made by the statute, is yet substantially proved, and is not only not questioned by the defendant *O'Malley*, but is admitted by him. The only formal paper which is wanting in the proofs, is the certified statement of the result signed by the inspectors; in lieu of that we have the statement of the result signed by the town clerk and recorded in the records of the town; and the evidence of Bell, the chairman, shows that this statement, though not signed by the inspectors, was authorized by them. We have the evidence that after the canvass Stahl was declared duly elected, not by the clerk, but by the chairman in the presence of the clerk. We have also the evidence that, in pursuance of the statute, the clerk notified Stahl of his election, and that he included his name as treasurer in his certificate to the county clerk of the names of the officers elected in the town for the year. This notice and certificate are both official papers, and required to be given or made by law. There was no attempt on the part of the plaintiffs to establish the election of Stahl as the successor of *O'Malley*, by any evidence except such as tended to prove the result as determined by a count of the votes cast. It was not sought to go behind the count of the votes, and attack or overturn that result by evidence of mistake or fraud in the count, or by attacking the legality of the votes cast at the election. The

evidence tended to prove, and did prove, the fact which should perhaps be regularly proved by the certified statement of the inspectors of the election; and as the proof was in no way contradicted, and the result admitted by the other claimant of the office to be such as the proof clearly established it, there does not seem to be any reason to question its sufficiency. The only rational ground for rejecting the evidence was the one taken in the court below and insisted upon here, that because the defendant denied the fact of the election of his successor, and refused to surrender the office, claiming to have been elected himself, the court had no power to hear any proof of any kind upon that subject.

I cannot think this to be the true rule. In controversies like the one at bar, and in proceedings for the delivery of books and papers pertaining to an office, some effect must be given to the result of an election as declared by the officers who are appointed to ascertain and declare in the first instance such result. Whether the duties of the canvassers appointed by law to ascertain and declare such result be ministerial only or *quasi* judicial, the result, as ascertained and declared. by them, must in my opinion be taken to be the true result until the contrary is made to appear. And when the result of such canvass shows the election of an individual to a particular office, and he qualifies within the time and in the manner prescribed by law, he is entitled to the office as against every other person laying claim thereto, until the result of the election so declared is set aside by the judgment of some competent court, in a direct proceeding for that purpose. In such case, the person declared to have been elected is not required to institute a proceeding to have the judgment which has already been given in his favor confirmed by the judgment of a court, before he can enter upon the duties of the office. If it be alleged by any one that the result thus ascertained and declared is not the true result, and that there is mistake, fraud or illegality, which, when made to appear, will

impeach such result, it is for the party charging such mistake, fraud or illegality, to initiate proceedings to avoid it on that account, and not the duty of the person declared elected to confirm it by the judgment of a court. We think it will be difficult to find any case which holds a contrary doctrine, when the result has been declared with all the formalities prescribed by law, and very few well considered cases where such result is proved satisfactorily, though not by all the formal evidence prescribed by law.

The rule, as I understand it, is this: that, as against a person holding an office by virtue of an election for a term of office which has expired, the person so holding over is estopped from denying that his successor was duly elected, when such successor shows that he was declared elected by the proper board of canvassers. He cannot avoid the effect of the decision of the canvassers by simply holding on to the office, and claiming that the decision of the canvassers was erroneous, or that the electors who cast the votes were not legal electors, or that fraud was practiced which when investigated would show a different result. If in such case he was a candidate for reëlection, he must himself commence proceedings by *quo warranto* against the party claiming the office, for the purpose of having the judgment of the canvassers reversed; and he cannot hold on to the office upon his mere claim that the judgment of the canvassers was erroneous. If he was not a contestant for the office, his duty is to surrender the official papers, records and moneys to the person duly declared elected, upon his having duly qualified. The law will not permit him, on the pretense of championing the losing party, to hold on to the office for his own benefit.

In McCrary's Treatise on the American Law of Elections, sec. 204, the author says: "Where two or more persons claim the same office, and where a judicial investigation is required to settle the contest upon the merits, it is often necessary to determine which of the claimants shall be permitted to qual-

ify and to exercise the functions of the office pending such investigation. If the office were to remain vacant, pending the contest, it might frequently happen that the greater part of the term would expire before it could be filled; and thus the interests of the people might suffer for the want of the services of a public officer. Besides, if the mere institution of a contest were to be deemed sufficient to prevent the swearing in of the person holding the usual credentials, it is easy to see that very great and serious injustice might be done. If this were the rule, it would only be necessary for an evil disposed person to contest the right of his successful rival, and to protract the contest as long as possible, in order to deprive the latter of his office for at least a part of the term. And this might be done by a contest having little or no merit on his side; for it would be impossible to discover, in advance of an investigation, the absence of merit. And again, if the party holding the ordinary credentials to an office could be kept out of the office by the mere institution of a contest, the organization of a legislative body, such for example as the House of Representatives of the United States, might be altogether prevented, by instituting contests against a majority of the members; or, what is more to be apprehended, the relative strength of political parties in such a body might be changed, by instituting contests against members of one or the other of such parties. These considerations have made it necessary to adopt and adhere to the rule, that the person holding the ordinary credentials shall be qualified and allowed to act pending a contest, and until a decision can be had on the merits." Again, in sec. 221, he says: "There can be no doubt but that a certificate of election, regular in form and signed by the proper authority, constitutes *prima facie* evidence of title to the office, which can only be set aside by such proceedings for contesting the election as the law provides;" citing *Commonwealth v. Baxter*, 35 Pa. St., 263; *Kerr v. Trego*, 47 id., 292; *The State v. The Governor*, 1 Dutch. (N.

J.), 331; *People v. Miller*, 16 Mich., 56; *Crowell v. Lambert*, 10 Minn., 369; *State v. Sherwood*, 15 Minn., 221; *State v. Churchill*, id., 455; *People v. Callaghan*, 83 Ill., 128. In *The People ex rel. v. Head*, 25 Ill., 325, the court say: "The decision of the canvassers affords *prima facie* evidence that the relator was legally elected and entitled to the office, till that canvass should be set aside by a proceeding to be instituted by the defeated candidate, in the courts of justice and in the forms of law." This was a proceeding by *mandamus*, to compel the incumbent to deliver the books and papers. The defendant claimed that he had been elected as his own successor, the same as the defendant in this action does; but it was held that such allegation was no defense to the proceeding by *mandamus*, and that, in order to avoid the effect of the certificate of election, he must proceed by *quo warranto*, and in the meantime surrender the books and papers to the person declared elected. In the case of *Crowell v. Lambert, supra*, which was also a proceeding to compel the delivery of the ·books and papers by the incumbent, who held over and refused to deliver them, claiming to have been elected his own successor, and having instituted proceedings to contest the relator's right to the office, which were pending at the time of the commencement of the proceedings by *mandamus*, the court say: "Some points were made by the defendant which we do not deem necessary to dwell upon. On the whole it may be said that the question here is, not who will be entitled to the office on an examination into the *merits* of the *election*, but who is now entitled to the possession of the books and papers appertaining to the office. The person holding the certificate is, under the circumstances of the case, *prima facie* the officer, and therefore entitled to the insignia and records of the office. . . . We do not deem it necessary to point out the inconveniences, resulting in some cases in a total denial of justice, which would follow if a party situated as the plaintiff is in this case, were compelled to await the result of

the election contest provided for by statute, a contest which might be prolonged until the term for which he was elected had expired." The following cases hold the same doctrine: *Hunter v. Chandler*, 45 Mo., 452; *Ewing v. Thompson*, 43 Pa. St., 372; *Ewing v. Filley*, id., 384; *Hadley v. The City of Albany*, 33 N. Y., 603; *Hulseman v. Rems*, 41 Pa. St., 396; *Marbury v. Marsden*, 1 Cranch, 137; *Allen v. McKeen*, 1 Sumner, 317; *Commonwealth v. Baxter*, 11 Casey, 264; *Ex parte Heath*, 3 Hill, 42; *The People v. Stevens*, 5 Hill, 616. And the opinion of Judge KENT, in a note at the end of the opinion in the case last cited, confirms the doctrine held by the above authorities.

The case of *Ex parte Heath*, 3 Hill, 42, which is referred to in the opinion of Judge KENT, holds that the result of the canvass may be proved by evidence other than the certificate of the officers required to give the same, when they refuse to issue the same, and that when such proof is made, and the title to the office thereby established, such evidence is to have the same effect as the certificate issued, and the contestant cannot attack the fairness of the election except by *quo warranto*. The case of *Ex parte Heath* was a *mandamus* to compel the mayor to administer the oath of office, which he had refused to do. The mayor refused because the returns of the ward canvassers failed to show an election. The returns of the canvassers did not declare the election of the relators. The return was as follows: " We have received returns from the several districts of said ward, etc., copies of which returns, certified by us, are hereto annexed. That it is impossible for us to declare what persons were by the greatest number of votes elected, by reason of lawless violence committed upon the inspectors of the first district whilst in the act of counting the ballots, and the dispersion of the ballots before they were counted." The return made showed the number of ballots cast for the respective officers in all other districts of the ward except the first district; and by counting the votes cast

in the districts, except in the first district, where they were destroyed, the relators had received a majority of the votes cast. The court held, that the act requiring the ward inspectors of the city of New York, on the completion of the canvass, *to set down in writing* the names of the candidates, etc., with the number of votes for each, and to certify and declare who have the majority, is satisfied by a certificate referring to copies of district returns annexed, which exhibit the requisite matters, though the majorities be not expressly declared, and that upon such return the relators were entitled to qualify and hold the offices, unless it appeared affirmatively that the votes which were cast in the first district and not returned would change the result. This case was appealed to the court of errors, and unanimously affirmed by that court.

After the decision in *The People v. Stevens*, 5 Hill, 616, the relator, Hodgkinson, made application to Judge KENT to compel the delivery of the books and papers pertaining to the office of clerk of the common council of the city of Brooklyn, to which office he claimed to have been elected by the common council. Judge KENT denied the application, but in his opinion in that case he says: "But it is obvious to me that the legislature never intended the judge should exercise his power to enforce the delivery of books and papers against an officer *de facto*, when the title of the applicant to the office is questionable. He must have a *prima facie* title, free from reasonable *doubt.*" This was said in a case where the applicant claimed to have been elected clerk by the common council of Brooklyn, although, upon the vote having been taken, nine votes were cast for the applicant and nine for the person claiming to hold the office, and the mayor had declared that there was no election. The ground of the claim made by the applicant was, that one of the persons voting for his opponent was not duly elected an alderman, and that his vote was cast for his opponent. It was an attempt on his part to attack the right of an alderman to his seat in the board, in a proceeding

The Supervisors of the Town of La Pointe vs. O'Malley and another.

to which he was not a party; and it was undoubtedly rightly held that he could not do so in that proceeding.

In the case of *The State ex rel. McDill v. The Board of State Canvassers*, 36 Wis., 498, it was held that a *mandamus* will issue to the board of canvassers to compel them to declare the person elected to an office, when the legal returns of the votes cast at such election show his election, notwithstanding the board of canvassers may have declared another person so elected. This decision goes upon the theory that the board of canvassers have no duty to perform except to compute, from the lawful returns made by the canvassers of the several voting districts, the number of votes cast for the several persons contesting for the office, and to declare that person elected who has received the greatest number of votes; and a declaration by such board that a person who has not received the greatest number of votes cast, as ascertained by such returns, is elected to the office, will be disregarded by this court, and the board be compelled to declare the party receiving the greatest number, so ascertained, elected, and, if the law so direct, to issue a certificate of election to such party; but the court will not go behind the returns to investigate frauds and mistakes, and adjudge which candidate was in fact elected. It seems to me that the decision in this case would be of no practical importance to the contestant for an office, if the declaration and certificate of election, made by the proper board of canvassers, did not give him a *prima facie* right to the office, and compel his contestant to initiate proceedings to determine the ultimate right to the office, if he claimed the same notwithstanding the returns made by the canvassing boards showed that he was not so elected.

We think there can be no question that, as between persons who are candidates for the same office, the one who receives the greatest number of votes as shown by the canvass made by the proper officers, and who is declared by such board elected, if he qualifies according to law, is *prima facie* the officer *de*

*jure*, and that every other person who assumes to exercise the duties of such office by holding over after the expiration of a former term of office, must be treated as a mere intruder or usurper, in any proceeding against him to compel him to deliver up the books and papers pertaining thereto, or to recover from him moneys or other property in his hands which has come to his possession by virtue of his office, and which by law he is required to deliver over to his successor in office. If there was fraud, illegality or mistake in the election or in the canvass, which, when made to appear, would show a different result, and that the former incumbent of the office was in fact elected his own successor, the only remedy of such claimant, as against the person declared to be elected and claiming the office, is to commence proceedings on his part by *quo warranto*, to determine the question as to who was in fact elected to such office, or, if the certificate of election be given contrary to the result as ascertained by the legal returns of votes, by *mandamus* to compel the canvassers to give him the certificate of election. Any other rule, as against persons in office and claiming to be elected their own successors, would be most unjust and highly prejudicial to the public welfare, and would place every person contesting for an office against the party then holding the same, at a great disadvantage. If a candidate for an office, contesting against the person holding the same, must not only beat his contestant at the polls, but must afterwards, and before he can be permitted to discharge the duties of his office and receive the emoluments thereof, contest his right again in the courts upon the mere claim of his contestant that the canvass does not show the true result of the election, such official candidate will have a most unjust advantage in the contest for office, and one which ought not to receive the judicial sanction.

The plaintiffs in this action have very clearly shown that *O'Malley*, the defendant treasurer, was not elected his own successor, as appears from the canvass of the votes cast at the

election in April, 1877, and that Thomas Stahl was elected such successor. This fact is not contradicted by the defendants. His successor, so elected, having duly qualified according to law, it became the duty of the outgoing treasurer to pay over to such successor the moneys in his hands belonging to the town.

III. There is no force in the claim that *O'Malley* was treasurer *de facto*, if not *de jure*. He had no color of title to the office, either by election or appointment. If he had any color of title, it was only such color of title as was given to him by the fact that he refused, for a few days after his term expired, to deliver up the books and papers, and during that time may have performed some duties pertaining to the office. If, by refusing to surrender the office, he became treasurer *de facto*, then he became so by the mere act of refusal, and such refusal for one day would make him the *de facto* treasurer as much as a continued refusal for a week or two weeks. And if a refusal to deliver the possession for a day, or a week, or two weeks, constitutes him treasurer *de facto*, so as to compel the party declared elected to proceed by *quo warranto* to oust him before any action can be had to compel him to deliver the books, papers and moneys belonging to such office, then the whole effect and force of a certificate of election would be avoided, unless the person elected should commence proceedings immediately to recover such books, papers or money. It is unnecessary to decide what force there would be in the claim that a treasurer holding over was treasurer *de facto*, if the person elected, or the town authorities, had neglected, for a considerable portion of the term for which the new treasurer had been elected, to take any proceedings to recover the moneys in the hands of the treasurer holding over, and during all that time he had continued to act as treasurer in fact. In this case there was no unreasonable delay on the part of the newly elected treasurer, or on the part of the officers of the town, in protesting against the right of the holding over treasurer to

exercise the functions of the office. It cannot be said that holding the office for some length of time, and performing its functions unquestioned, was in itself color of title to the same, as the evidence shows that there was no such holding of the office by the defendant *O'Malley* in this case. On the other hand, the evidence shows that his right was questioned immediately after the election, and as soon as the newly elected treasurer was qualified, and this action to recover the money in his hands as late treasurer was commenced without any unreasonable delay. The fact that the acts of the treasurer holding over might be good as to third persons and the public, so long as he refused to surrender the office and continued to perform the official duties thereof, furnishes no good reason for holding that he cannot be proceeded against in an action on his bond to recover the moneys in his hands which by law he ought to pay over to his successor in office.

It is further urged, that until some other person claimed to exercise the functions of treasurer of the town, the defendant *O'Malley* was bound to retain the books, papers and money in his hands; that he could not commence proceedings by *quo warranto* to determine his right to such office, until some other person claimed the office, against whom he could proceed, and therefore he was justified in retaining the same until such other claimant appeared.

We think that the taking and filing of the oath of office and his official bond by the person declared to have been elected treasurer, and his demand of the late treasurer, of the books, papers and moneys in his hands, was such an intrusion and usurpation of the office, if he was not in fact elected, as would have justified and sustained proceedings against him by the hostile claimant by *quo warranto*. This was so expressly decided in *People v. Callaghan*, 83 Ill., 128, and we have no doubt of the correctness of such decision.

IV. The only other question is, whether the judgment is correct as to the amount of moneys found in the hands of the

defendant treasurer. After a careful examination of the evidence upon this question, we think the court erred in finding that the defendant had received from the county treasurer the sum of $1,835.11 belonging to the school district of La Pointe. The evidence shows that the county treasurer was unable to produce any receipt of the treasurer *O'Malley*, showing that he ever received this sum. The county treasurer swears that he had a receipt for it, and that it was paid by him to *O'Malley* on the 17th of October, 1873. He also swears that he paid him the sum of $2,000, on the same day on which he claims to have paid the sum of $1,835.11, and for the $2,000 a receipt was shown in court. *O'Malley* swears that he never received the sum of $1,835.11, and that George Stahl, who was the county treasurer, and as such claims to have paid him that sum on account of moneys belonging to "the school district of La Pointe," was at the same time treasurer of such school district; and he claims that, instead of paying it to him as town treasurer, he paid it to himself as treasurer of said school district. In view of the facts that there is no evidence of the payment of this sum to treasurer *O'Malley*, other than the unsupported evidence of the county treasurer, Stahl; that no receipt for the same is produced, whilst a receipt for the sum of $2,000, paid on the same day this sum is alleged to have been paid, is produced in evidence; that the report of the county treasurer, Stahl, made November 11, 1873, does not state that this sum was paid to the town of La Pointe, or to the treasurer thereof, but that it was paid on the 17th of October, 1873, to "the school district of La Pointe;" that the town treasurer, *O'Malley*, claims in his account no credit for moneys paid to such school district after the alleged payment to him October 17, 1873, of any part of said sum; and the absence of any proof on the part of the plaintiff that the school district had not received the said sum of $1,835.11 — we are clearly of the opinion that the evidence is wholly insufficient to charge the defendant *O'Malley* with the receipt

of that sum. With the exception of this sum of $1,835.11, the evidence fully sustains the finding of the court below.

Orton, J. While admitting the correctness of the legal propositions upon which the majority of the court has decided this case, I regret that I cannot coincide with the opinion that the case upon the record is brought within these conceded legal principles, or sustained by a single authority cited in the opinion.

*O'Malley* had, for three successive years, held the office of town treasurer, and in the spring of 1877 was a candidate for a reëlection. By the legal tenure of his office, he was to hold and administer it until his successor should be duly elected and qualified. The respondents claim that, in the spring of 1877, one Stahl was duly elected as the successor of said *O'Malley*, and, having qualified, he demanded the property and money belonging to said office, of *O'Malley*, who denied his election and claim to said office, and refused to deliver to him said property and money. Suit is brought upon the official bond of *O'Malley*, upon this breach of its conditions, and by the pleadings the legal right of Stahl to the office is put in issue.

*O'Malley*, by holding over his legal term to await the election and qualification of his successor, is in the fullest sense treasurer *de facto*, and in no sense an *intruder*, and, before delivering over to any one the property and moneys of his office, had a right, and it was his duty, to demand of any person claiming the office, the evidence of his election and qualification. I admit that in such a case as this the full right to the office *de jure* cannot be determined, and agree with the opinion that only a presumptive or *prima facie* legal right to the office need be shown by the person so demanding the property and moneys belonging to it, and in the hands of his predecessor; and also agree with the opinion, that in this case it was necessary and incumbent upon the

respondents to prove by proper evidence that Stahl had such *prima facie* right.

All the authorities cited in the opinion hold that such *prima facie* right to an office must consist of the proper certificate of election required by law to be given, or of the canvass or statement of the votes and determination of the result by the proper officers of the election, as required by law.

One case holds, that in case such a canvass or statement and determination have been duly made, and the proper officers have failed to make out the proper certificate of election based thereon, proof of such canvass or statement and determination of the result, as required by law, will be sufficient *prima evidence* of the legal right to the office.

But no case is cited, and I do not believe one can be found, holding that any evidence *less* than either the proper certificate of election, or the canvass or statement of the votes and determination of the result by the proper election officers, as required by law, is *prima facie* evidence of such right.

Our statute does not provide for certificates of election to town offices; but it does provide *particularly*, that "at the close of every election, the votes given by ballot shall be publicly canvassed by the inspectors," that "the canvass being completed, and the result *ascertained* and *determined* by the inspectors, the clerk shall publicly *read* to the meeting the names, etc., and the names of the persons *declared to be* duly elected by the inspectors to each office respectively; and such *reading* shall be deemed sufficient *notice* to every person elected to any office at such meeting, *of his election;*" that "the inspectors shall also *draw up a statement in writing*, setting forth in words at full length, etc., etc., and *certify* upon such statement their determination of the persons elected, which *statement* and *certificate* of determination shall be left with the town clerk and *recorded* in his office." Not a single one of these provisions was complied with in this case.

No canvass, statement or determination or certificate was

The Supervisors of the Town of La Pointe vs. O'Malley and another.

ever made by the inspectors, and of course none was or *could be* either publicly *read* or *recorded* by the clerk as the statute requires. It is in evidence that the *clerk* never made any public announcement of the result, but one was informally and orally made by one of the inspectors, and the clerk entered upon his records and signed a statement made by himself.

No writing was made or recorded, and no result ascertained or determined, and no paper read or announcement made, as required by law.

Such being the case, how is it possible to find any *prima facie* evidence of the legal right of Stahl to the office, when not a single thing was done, or exists of record, which the statute requires, and which could possibly constitute such evidence. It is very easy to say that something which the statute does *not* require or sanction, *was* done, and by some *other* person, and which will answer as a sufficient substitute, and by which proof of a *prima facie* right to an office may be made; but it is hardly fair or logical to cite authorities which require the very evidence which is entirely wanting in this case to sustain such a proposition.

If this decision affected this case alone, it would only have the importance and consequence commensurate with the individual interests of the parties, and would be comparatively of little moment; but as a precedent by which all future cases of like character and of the same insufficient evidence, or the same absence of all legal evidence, are to be determined, such a decision should be supported by analogous cases and decisions of other courts, or rest upon unquestionable principle.

In support of my opinion, most reluctantly formed, and thus rather crudely expressed, dissenting from my learned associates, I refer with confidence to the authorities cited in the opinion of the court, as abundantly sufficient.

*By the Court.* — So much of the judgment of the circuit

The Supervisors of the Town of La Pointe vs. O'Malley and another.

court as awards execution in favor of the plaintiffs for the sum of $10,615.78 damages, is reversed, with costs, and the cause is remanded with directions to the circuit court to award execution in favor of the plaintiffs for the sum of $8,780.67, with interest from the 3d day of October, 1877.

RYAN, C. J., took no part.
A motion by the appellants for a rehearing was denied.

[NOTE. For the information, especially, of persons consulting these reports who are not residents of this state, those provisions of our statutes relating to the election of town officers in force in April, 1877, which seem to bear upon the principal question determined in the foregoing case, are inserted here. These provisions are found on pages 353–361 of Taylor's Statutes, being part of ch. 15, "Of Towns and Town Officers," etc.

Sec. 28 provides that at the annual town meeting there shall be elected, among other town officers, three supervisors, one of whom shall be designated on the ballots as chairman, one as town clerk, and one as treasurer. Sec. 43 provides that " the chairman of the supervisors in each town shall be the chairman of the town meetings," with a provision for filling the vacancy in case of his absence. Sec. 44 provides that " the supervisors of each town shall be the board of inspectors of the election at the town meetings thereof," with a provision for filling any vacancy in such board. Sec. 49 provides that all town officers shall be chosen by ballot, with some exceptions not important here. Sec. 57 declares that "the chairman of each town meeting shall regulate its proceedings, and decide all questions of order arising at such meeting, and shall make public declaration of all votes passed." Sec. 60 declares that " at the close of every election, the votes given by ballot shall be publicly canvassed by the inspectors, at the place where the meeting was held." Sec. 61 requires that "before the ballots are opened, they shall be counted and compared with the number of names of voters on the poll list;" provides what shall be done in case two or more ballots shall be found folded together, and in case the number of ballots shall be found to exceed that of names on the poll list; and adds: " The number of ballots and the number of names on the poll list agreeing, or being made to agree, the board shall then proceed to canvass and estimate the votes." Secs. 62 and 63 are as follows:

" Sec. 62. The canvass being completed, and the result ascertained and determined by the inspectors, the clerk shall publicly read to the meeting the names of the person for whom votes for each office were given, and the number of votes so given to each person, and the names of the persons declared to be duly elected, by the inspectors, to each office respectively; and such read-

ing shall be deemed sufficient notice to every person elected to any office at such meeting, of his election, whose name has been entered on the poll list as a voter.

"Sec. 63. The inspectors shall draw up a statement in writing, setting forth, in words at full length, the whole number of votes given for each office, the names of the persons for whom such votes were given, and the number of votes given to each person; and certify upon such statement their determination of the persons elected; which statement and certificate of determination shall be left with the town clerk, and recorded in his office."

Sec. 64 provides that "the persons having received the greatest number of votes given for any office at such election, shall be deemed and declared duly elected." Sec. 65 makes it the duty of the town clerk, within ten days after the election, to transmit to the clerk of the board of supervisors of the county a certified statement of all officers elected in his town. REP.]